DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>RONIEL ALLEMBERT, )<br>)<br>Defendant. )<br>) | Criminal No. 2022-0010 |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Gabriel J. Villegas, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant Roniel Allembert's "Motion to Suppress" (Dkt. No. 31), the Government's "Opposition to Defendant's Motion to Suppress" (Dkt. No. 33), the supplemental briefing by the parties (Dkt. Nos. 58, 59), and the evidence and arguments presented at the suppression hearing. For the reasons that follow, the Court will deny Defendant's Motion to Suppress.

### I. BACKGROUND

On May 27, 2022, the Government filed a two-count Information against Defendant (Dkt. No. 24).[1] Count 1 is the knowing possession of a firearm within a distance of 1,000 feet of a school in violation of Title 18 United States Code §§ 922(q)(2)(A) and 924(a)(4). *Id*. at 1. Count 2 is the

---

[1] Prior to the filing of the Information, the Government commenced this action by filing a Criminal Complaint on April 19, 2022. (Dkt. No. 1).

knowing possession of a firearm without being authorized by law in violation of Title 14 Virgin Islands Code § 2253(a). *Id*. at 2.

Defendant filed the instant Motion to Suppress. At the suppression hearing which followed, the Government presented the testimony of Task Force Officer ("TFO") Sergeant Aldemar Santos and TFO Moses President. The following facts emerged from the record established prior to and at the suppression hearing.[2]

On September 28, 2021, officers of the Virgin Islands Police Department ("VIPD") and the Drug Enforcement Administration investigated a suspected marijuana cultivation site at a residential property located at #21 Anna's Hope. (Dkt. No. 31-2 at ¶ 4). According to testimony from TFO Santos during the suppression hearing, TFO Santos arrived at the residence in his VIPD marked police vehicle and observed a blue vehicle parked in front of #21 Anna's Hope. (Dkt. No. 56 at 11). As officers walked over to observe who had parked in front of the house, the blue vehicle sped off at a high rate of speed toward TFO Santos' vehicle such that TFO Santos had to pull off the road to avoid a collision. *Id*. at 11. The blue vehicle traveled past TFO Santos and made a right turn onto Queen Mary Highway. *Id*. at 13. TFO Santos activated his lights and siren and pursued the vehicle to conduct a traffic stop. *Id*. at 13. The blue vehicle made a right turn into the west entrance of Anna's Hope and TFO Santos continued in pursuit. *Id*. at 14. The driver of the blue vehicle, later identified as Defendant Roniel Allembert, came to a stop on his own. *Id*. at 15. Defendant exited his vehicle with his hands raised and walked toward TFO Santos. *Id*. TFO Santos also exited his vehicle and patted Defendant down using his bare hands, searching his shoulders,

---

[2] The background factual discussion in this section is based in part on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but not conceded or proven beyond a reasonable doubt at this stage of the litigation.

side, and waist for a firearm, but did not find any weapons. *Id*. at 16, 36. TFO Santos asked Defendant why he was traveling at such a high rate of speed and Defendant responded that he does not like police. *Id*. at 16.

TFO Santos further testified that TFO President also arrived to assist him at the scene and while TFO Santos spoke to Defendant, TFO President stated that he observed marijuana in Defendant's vehicle. *Id*. at 15, 17. After conducting a search of the vehicle for illegal substances, TFO President told TFO Santos that all he saw was marijuana residue. *Id*. at 20. TFO Santos allowed Defendant to leave without incident. *Id*.

TFO Santos testified that he traveled back to #21 Anna's Hope after the traffic stop and observed that Defendant had returned to the residential property. *Id*. at 21-22. Defendant parked his vehicle in front of the property and yelled at the officers: "I hope you didn't find a gun in my car or you would see what would happen." *Id*. at 23. He also yelled "I hope the next time you guys go into a house you guys are met with a chopper."[3] *Id*. at 24.

TFO President testified that he remained in the area of the vehicle stop and observed that within five minutes of leaving, Defendant returned, driving slowly as if the driver of the vehicle was searching for something on the side of the road. *Id*. at 57-58. Upon seeing TFO President's unmarked police car, Defendant drove off. (Dkt. No. 1-1 at ¶ 7). TFO President called TFO Santos and additional members of law enforcement to assist him in searching the area for anything that Defendant may have discarded. (Dkt. No. 56 at 58). The officers discovered a firearm holster on top of the grass, and with the aid of a canine unit, discovered a loaded firearm laying in an area with heavy foliage—157 feet away from the holster and 290 feet from the Church of God of

---

[3] TFO Santos testified that the term "chopper" is common street slang referring to a gun that can fire automatic rounds, such as a machine gun. (Dkt. No. 56 at 24).

Holiness school. *Id*. at 58-61. Forensic Officer G. Daniel stated in the Crime Scene Evidence Report that in the process of collecting the firearm as evidence, TFO Santos' left glove broke, causing him to make direct contact with the firearm. (Dkt. No. 31-3 at 1).

According to TFO President's Affidavit in Support of Arrest Warrant (Dkt. No. 1-1), TFO President contacted the firearms bureau and learned that Defendant did not have a license to own or possess a firearm within the Territory of the United States Virgin Islands. *Id*. at ¶ 13. On November 15, 2021, Magistrate Judge Ernest E. Morris Jr. of the Superior Court of the Virgin Islands issued a search warrant to retrieve a DNA sample from Defendant to determine if it matched the DNA found on the firearm. *Id*. at ¶ 14. After retrieving and analyzing a sample of Defendant's DNA, the VIPD Forensic Unit confirmed that Defendant's DNA was present on the firearm receiver, magazine, slide, and holster. *Id*. at ¶ 15-16.

In Defendant's Motion to Suppress, he asserts that because the initial stop of Defendant was unlawful, all subsequent evidence that was retrieved thereafter must be suppressed. (Dkt. No. 31). Defendant also asserts that there was no probable cause to support the search warrant authorizing the collection of his DNA, and asks the Court to suppress the results of the DNA analysis on the firearm and holster. (Dkt. No. 31 at 5-7, Dkt. No. 59 at 1-3). Defendant further argues in his Supplemental Memorandum that the Government failed to prove that Defendant abandoned the firearm. (Dkt. No. 59 at 3-4).

The Government argues, on the other hand, that the traffic stop was lawful because Defendant violated several traffic codes, and there was probable cause to support the search warrant based on the totality of the circumstances. (Dkt. No. 33 at 3-4). The Government further argues that Defendant abandoned the firearm because he discarded it while fleeing from police

4

before he was seized. (Dkt. No. 58 at 4). Thus, the Government maintains that Defendant's Motion to Suppress should be denied.

## II. DISCUSSION

### A. Traffic Stop

#### 1. Applicable Legal Principles

The Fourth Amendment to the United States Constitution protects individuals from, *inter alia*, unreasonable seizures. U.S. Const. amend. IV. "A traffic stop, even if brief and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Hurtt*, 31 F.4th 152, 158-59 (3d Cir. 2022) (internal quotations and citations omitted). Such a seizure does not violate the Fourth Amendment, however, if it is reasonable. *Id*.

"Traffic stops . . . may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018). Where police have directly witnessed a traffic violation, a traffic stop is a reasonable seizure under the Fourth Amendment. *See United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("[A] traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."). Further, "the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)). Any subsequent investigation after a traffic stop "must be reasonably related in scope to the reasons for the stop." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

### 2. Analysis

The Government argues that TFO Santos conducted a lawful traffic stop of Defendant based on his observation that Defendant drove at a high rate of speed toward Queen Mary Highway, forcing TFO Santos to pull off the road to avoid a collision. (Dkt. No. 33 at 3, Dkt. No. 33-1 at ¶¶ 6-7). TFO Santos testified at the suppression hearing that "[Defendant] traveled at such a high rate of speed in my direction, I had to pull off the road because the way he was driving I would have end[ed] up colliding with the vehicle." (Dkt. No. 56 at 12). He further stated that "[a] high rate of speed to me is a vehicle traveling in a manner that I perceive it to be reckless because the way he was driving and what I perceived that day is that he was traveling so fast that my instinct kick[ed] in and I pulled off to the side of the road."[4] *Id.* at 33. The Government asserts that this amounted to several traffic violations, any of which were sufficient to justify the traffic stop, including speeding (Title 20 V.I.C. § 494), failure to remain on left side of street (Title 20 V.I.C. § 495(a)), and reckless driving (Title 20 V.I.C. § 492). (Dkt. No. 33 at 3).

Defendant argues that the seizure was a *Terry* stop[5] rather than a traffic stop. Defendant maintains that "law enforcement failed to provide the requisite reasonable suspicion to justify making contact with Mr. Allembert" and that the "vague claim that Allembert drove off from a residence at a high rate of speed" is insufficient to garner reasonable suspicion to justify stopping

---

[4] TFO Santos stated that based on his training in traffic enforcement and general experience as a law enforcement officer, he believed that Defendant exceeded the 20 mile-per-hour speed limit imposed in residential areas. (Dkt. No. 56 at 45-46).

[5] In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (internal quotes omitted). Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Campbell*, 332 F.3d at 205 (citing *Terry*, 392 U.S. at 21).

him. (Dkt. No. 31 at 4). Defendant argued that for "[w]hatever reason, when President [gestured to pull over the vehicle] law enforcement follows. . . . That is why Officer Santos went after Mr. Allembert. It had nothing to do with an almost collision. It had nothing to do with a high rate of speed. Those are all conjured up excuses." [6] (Dkt. No. 56 at 79-80). Thus, Defendant claims that any evidence obtained by law enforcement during the stop and thereafter must be suppressed under the "fruit of the poisonous tree" doctrine. *Id.*; *Segura v. United States*, 468 U.S. 796, 804 (1984) (noting that "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'").

Defendant's argument that TFO Santos pulled over Defendant based on TFO President's direction requires the Court to conclude that TFO Santos' testimony should be discredited. However, based on the Court's observations during the suppression hearing, the Court credits the testimony of TFO Santos regarding the circumstances surrounding the stop of Defendant's vehicle. TFO Santos' demeanor on the stand was calm and collected, recounting events in an organized and persuasive manner. He recalled the matter at hand in detail and with consistency, clearly setting forth facts to demonstrate that Defendant's driving—which forced TFO Santos to pull off

---

[6] TFO Moses President stated in his Affidavit in Support of Search Warrant (Dkt. No. 31-2) that while standing outside #21 Anna's Hope on September 28, 2021 to wait for forensics and other supporting units to arrive, TFO President observed a blue vehicle stop in front of the property, and "[s]eemingly upon observance of the police units, the driver drove off at a high rate of speed . . . which forced TFO Sgt. Aldemar Santos to pull off the road to avoid a collision." *Id.* at ¶ 6. TFO President further stated in his Affidavit and testified at the suppression hearing that he signaled to indicate to TFO Santos to attempt to administer a traffic stop of the blue vehicle. (Dkt. Nos. 31-2 at ¶ 8; 56 at 53). While TFO Santos' testimony was similar to that of TFO President regarding the manner in which Defendant sped away, TFO Santos testified that TFO President did not direct him to stop the blue vehicle (Dkt. No. 56 at 32), suggesting to the Court that TFO Santos did not see the hand gesture. In making his argument, Defendant focuses on the hand gesture as the alleged basis for the stop, while completely ignoring the statements of both TFO President and Santos as to the manner in which Defendant was driving.

the road to avoid a collision—was such as to create reasonable suspicion that he had violated the traffic laws. *See United States v. Murphy*, 402 F. Supp. 2d 561, 570-71 (W.D. Pa. 2005) (finding defendant credible in part because "even upon vigorous and effective cross-examination by the [government], his version of the events of that evening never wavered"). Further, TFO Santos' recollection of the events was corroborated by TFO President, who similarly testified that "the driver of the vehicle sped off at a high rate of speed."[7] (Dkt. No. 56 at 51). *See United States v. Christian*, Criminal No. 2017-0017, 2018 U.S. Dist. LEXIS 23892, at *11 (D.V.I. Feb. 14, 2018) (finding witness credible in part because of corroborating testimony from another witness); c*f. United States v. Jackson*, 560 F. Supp. 2d 331, 336-37 (D. Del. 2008) (finding the officers' testimonies during the suppression hearing not credible due to inconsistencies).

For these reasons, TFO Santos' testimony "withstands the common sense test" for credibility.[8] *United States v. Davis*, Criminal No. 2:13-cr-00068, 2014 U.S. Dist. LEXIS 48843, at *9-10 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). The Court further finds that based on TFO Santos' and TFO President's testimony regarding the manner in which Defendant was driving his vehicle, TFO Santos had ample reasonable suspicion to support a traffic stop of the vehicle. Accordingly, the Court concludes that

---

[7] The Court deems irrelevant the issue as to whether TFO Santos pulled over Defendant based on TFO President's hand gesture. Because the Court credits the testimony of TFO Santos and TFO President that Defendant drove off at a high rate of speed, there was ample reason for TFO Santos to conduct a traffic stop.

[8] During the suppression hearing, Defendant questioned TFO Santos about why he executed the traffic stop but did not issue a traffic citation. (Dkt. No. 56 at 33-34). TFO Santos responded that he did not issue a traffic citation because returning to #21 Anna's Hope to continue his investigation was a more pressing matter, and he therefore allowed Defendant to depart with a warning. (Dkt. No. 56 at 44). The Court does not find TFO Santos' decision to issue a warning instead of a traffic citation inconsistent with his decision to conduct a traffic stop.

it was constitutionally permissible for law enforcement to conduct a traffic stop based on the observed infractions of traffic laws.

  **B. Search Warrant**

    **1. Applicable Legal Principles**

The Fourth Amendment protects citizens against unreasonable searches and seizures by imposing a warrant requirement, with a few exceptions, and further requiring that such warrant shall not issue but upon probable cause. U.S. Const. amend. IV. It is well established that the Fourth Amendment is implicated when a search involves an intrusion into the human body. In *United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011), the Third Circuit ruled that "[t]he collection of a DNA sample constitutes an invasion of privacy that is subject to the strictures of the Fourth Amendment." *Id*. at 406. The Supreme Court has held, in particular, that "a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *Maryland v. King*, 569 U.S. 435, 446 (2013).

Probable cause exists for a search warrant where "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Vosburgh*, 602 F.3d 512, 525–26 (3d Cir.2010) (citing *Illinois v. Gates*, 462 U.S. 213 (1983) (emphasis added)); *see also Zurcher*, 436 U.S. at 557 n. 6 (a search warrant is supported by probable cause where "the items sought are in fact seizable by virtue of being connected with criminal activity"). Thus, the issuance of a search warrant for DNA is proper only where the supporting affidavit provides a basis for believing that the individual's DNA can link the individual to a criminal act. *See, e.g., United States v. Bonds*, 12 F.3d 540, 549 (6th Cir.1993) (affirming magistrate's finding of probable cause to issue a search warrant for blood and hair samples when affidavit established that DNA could link the suspect to blood stains found in

a car used in connection with a homicide); *United States v. Flanders*, Cr. No. 10–29, 2010 WL3702512, at *3 (D.V.I. Sep. 15, 2010) ("[T]he issuance of a search warrant for DNA is only proper where the affidavit supporting the application provides a basis for believing that the individual's DNA can link the individual to a criminal act."); *United States v. Solomon*, 2007 WL 927960, at *4 (W.D.Pa. 2007) (finding probable cause where affidavit alleged facts to establish that defendant's DNA would be found on a firearm used in a homicide).

In reviewing a search warrant, the court must determine whether, under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. *United States v. Davis*, 383 F. App'x 172, 173 (3d Cir. 2010). The magistrate judge's determination of probable cause is subject to significant deference. *Gates*, 462 U.S. at 236. "[T]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238. The court must "uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." *United States v. Conley*, 4 F.3d 1200 (3d Cir. 1993).

### 2. DNA Evidence

Defendant requests that the Court suppress the evidence of his DNA on the firearm on the basis that the "search warrant lacks probable cause because President failed to include in his affidavit a factual basis as to why he believed Mr. Allembert possessed a firearm." (Dkt. No. 31 at 6). Defendant claims that the search warrant was based primarily on TFO President's observation that Defendant drove slowly through the site of the traffic stop and "[a]pparently, President believes that driving at a high rate of speed is equally suspicious as driving slowly." Id. at 7.

10

Further, he claims that TFO President's belief that the holster and firearm were tossed out of Defendant's vehicle is "conclusory," and "without any observation or factual support of such conduct." *Id*.

The Government argues that there was sufficient probable cause for the magistrate to issue the warrant based on the fact that Defendant stopped at, and drove away from, a marijuana grow scene; alluded to having a firearm in his car when he returned to #21 Anna's Hope after the traffic stop; returned to the scene of the traffic stop searching for something on the side of the road; and the gun and holster were recovered from the same site where Defendant had been searching. *Id*.

The Court agrees that there is an abundance of circumstantial evidence linking Defendant to the firearm and holster that were recovered, such that there was a fair probability that a DNA swab would reveal evidence of a crime—namely that Defendant possessed the firearm. Based on the record before the Court: (1) Defendant drove away at a high rate of speed, including from law enforcement attempting to execute a traffic stop; (2) Defendant returned to #21 Anna's Hope following the traffic stop, and while yelling at law enforcement, alluded to a firearm in his car when he stated: "I hope you guys had found a gun in my car and see what would have happen." (Dkt. No. 33-1 at ¶ 11); (3) Defendant returned to the scene of the traffic stop within five minutes of being released by law enforcement, driving slowly as if in search of something in the bushes along the side of the road, *id*. at ¶ 12; (4) Defendant "saw TFO President's unmarked police vehicle" while searching and "drove off"—behavior suggestive of suspicious activity (Dkt. No. 1-1 at ¶ 7); and (5) law enforcement discovered the holster and the firearm in the area where the traffic stop occurred and Defendant was searching, with the holster laying on top of the grass as if it had been recently discarded (Dkt. No. 56 at 25-26). The totality of these circumstances suggest a fair probability that Defendant was linked to the firearm. Upon confirming that Defendant did

11

not have a license to possess a firearm in the Virgin Islands, there was probable cause that Defendant unlawfully possessed the firearm.

Defendant suggests that it is unreasonable to find evidence of probable cause simply because an individual is driving slowly. *See* Dkt. No. 31 at 7 ("Apparently, President believes that driving at a high rate of speed is equally suspicious as driving slowly."). However, the suspicion arises not simply from the speed at which Defendant was driving, but rather the speed together with the attendant circumstances as discussed herein. Indeed, courts have found situations in which driving slowly was a contributing factor for finding probable cause. *See United States v. Johnson*, No. 04-103-SLR, 2005 U.S. Dist. LEXIS 24029 (D. Del. Oct. 19, 2005) (denying motion to suppress where defendant driving slowly around a parking lot was indicative of someone involved in illegal behavior and a contributing factor to finding probable cause for arrest); *see also Maddrey v. Giroux*, No. 15-487, 2015 U.S. Dist. LEXIS 152776, at *7-9 (E.D. Pa. Nov. 9, 2015) (driving slowly around a complex the night before it was robbed was a contributing factor to find probable cause for arrest).

Based on the foregoing, the Court finds that the Government met its burden of showing that there was probable cause to issue a search warrant to obtain a sample of Defendant's DNA.

      **3.**     *Franks* **Challenge**

As a general rule, the validity of an affidavit in support of probable cause for a search warrant is presumed. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). However, in *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court established that "a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause" subsequent to the issuance of the warrant, and "created a mechanism to allow a defendant to overcome the general presumption" of the affidavit's validity. *Yusuf*, 461 F.3d at 383.

To be entitled to a *Franks* hearing, the defendant must first make a "substantial preliminary showing" that the affidavit contains either a false statement or an omission that was "made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *Id*. (citing *Franks*, 438 U.S. at 171; *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). "In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses. *Yusuf*, 461 F.3d at 383 n.8 (quoting *Franks*, 438 U.S. at 171); *see also United States v. Heilman*, 377 F. App'x 157, 177 ("The preliminary-showing requirement is intended to 'prevent the misuse of a veracity hearing for purposes of discovery or obstruction.'") (quoting *Franks*, 438 U.S. at 170-71). "[T]he reviewing court must be presented with credible and probative evidence that the omission of information in a [warrant] application was designed to mislead or was made in reckless disregard of whether it would mislead." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "[M]isstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression." *Id*. at 153 (quoting *Franks*, 438 U.S. at 171).

If the defendant makes the required substantial preliminary showing, he must then prove by a preponderance of the evidence at a *Franks* hearing that (1) "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) [] such statements or omissions were material, or necessary, to the probable cause determination." *Yusuf*, 461 F.3d at 383 (citing *Sherwood*, 113 F.3d at 399); *see also United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011) ("To prevail at the hearing, the defendant must then prove these points [made at the preliminary showing stage]

13

by a preponderance of the evidence."); *United States v. Valencia-Trujillo*, No. 8:02-CR-329-17-EAJ, 2006 U.S. Dist. LEXIS 101865, at *8 (M.D. Fla. Apr. 17, 2006) ("If the court decides that a *Franks* hearing is appropriate, Defendant must prove the allegations [made at the preliminary showing stage] by a preponderance of the evidence during the hearing to be entitled to relief."). Where the defendant shows that the affiant knowingly or recklessly omitted information from an affidavit, "the court must remove the 'falsehood created by [the] omission by supplying the omitted information to the original affidavit.'" *Id*. at 384. After this revision is made, "the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit[.]" *Id*. at 383.

Here, Defendant notes that TFO Santos conducted a physical search and pat down of Mr. Allembert without gloves and shortly thereafter "picked up the firearm with a broken glove." (Dkt. No. 59 at 2). Defendant states that "President did not inform the magistrate judge of these omissions" and asserts that "[t]he magistrate judge clearly would not have signed the warrant if he knew that Santos had planted the suspect's DNA on the firearm." *Id*. at 3. Defendant states that "[t]he suppression hearing turned into a *de facto Franks* hearing when the testimony revealed that President omitted from his affidavit that Santos touched Mr. Allembert and the firearm which spoiled the evidence." *Id*. at 2. Defendant cites no case law to support his assertion that the magistrate judge would not have signed the warrant if he had known about the possible contamination of the evidence. (Dkt. No. 59 at 2).

The Government argues that "there has been no demonstration that either TFO Santos or President had a willingness to distort the truth" and that TFO President did not include information about the torn glove in his affidavit in support of the search warrant because TFO Santos was already a known person and the purpose of obtaining Defendant's DNA was to identify the DNA

14

of an unknown individual. (Dkt. No. 58 at 3-4). The Government further notes that "[i]f the torn glove issue had been included [in TFO President's affidavit], it in no way negates that probable cause. The potential contamination issue goes to the weight of the potential evidence." *Id*. at 3.

As an initial matter, the Court finds that the suppression hearing did not turn into a *de facto Franks* hearing. The Court must therefore determine whether a *Franks* hearing is necessary in light of Defendant's allegations. In this regard, the Court finds that Defendant fails to make a substantial preliminary showing that the omission of information about the possible contamination of the DNA evidence from TFO President's affidavit was designed to mislead, made with reckless disregard of whether it would mislead, or was material to the finding of probable cause. A *Franks* hearing is therefore unwarranted here.

First, Defendant provides no "credible and probative evidence that the omission of information in [the warrant] application was designed to mislead or was made in reckless disregard of whether it would mislead." *Rajaratnam*, 719 F.3d at 154. TFO President testified that he did not believe it was necessary to include in his affidavit that TFO Santos' glove broke because "Sergeant Santos is a known person, and we're trying to find the unknown person whose DNA is on the firearm." (Dkt. No. 56 at 68). TFO President's testimony suggests that he only considered that the broken glove could result in the transfer of TFO Santos' DNA—and not Defendant's DNA from the pat down—onto the firearm. This supports a finding that TFO President did not include the information about TFO Santos' broken glove because he did not think it was relevant to the finding of probable cause, and not for some other nefarious reason. Defendant presents no reason for the Court to find that TFO President's omission was intended to mislead or was made in reckless disregard of whether it would mislead.

15

Second, Defendant likewise has not made a preliminary showing that any alleged contamination resulting from TFO Santos' broken glove was material to the finding of probable cause such that a magistrate judge would not have granted the search warrant if the information had not been omitted. Ultimately, the issue of whether the DNA evidence was contaminated is a question for the jury to consider when determining the weight of the evidence rather than an issue put forth as a challenge to the admissibility of the evidence. *See United States v. Goodrich*, 739 F.3d 1091, 1098 (8th Cir. 2014) ("The contamination of the DNA evidence in the collection process and the weight to give it are questions for the jury to decide" rather than something to be considered for admissibility.); *see also United States v. Wilbern*, No. 20-3494-cr, 2022 U.S. App. LEXIS 28808, at *5 (2d Cir. Oct. 18, 2022) ("evidence of contamination and irregularities in the DNA [evidence] goes to the weight of the evidence, not its admissibility."); *Redden v. Calbone*, 223 F. App'x 825, 830 (10th Cir. 2007) (stating that "flaws in the chain of custody that might have resulted from the police's handling of the evidence, such as contamination, go to the weight of the evidence" and do not support a motion to suppress); *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1263-64 (D.N.M. 2013) (Defendant's suggestions that there may have been contamination or mislabeling of DNA evidence are matters going to the weight of the evidence and not its admissibility). Accordingly, a magistrate judge presented with an application for a warrant to collect Defendant's DNA—with a revised affidavit laying out the possibility that a portion of the evidence may be contaminated—would still find probable cause to grant the search warrant based on the totality of the circumstances presented in Section II.B.2, *supra*.

Based on the foregoing, Defendant has failed to make a substantial preliminary showing sufficient to warrant a *Franks* hearing.

C.      Abandonment

1.      Applicable Legal Principles

"The Fourth Amendment does not protect abandoned property." *United States v. Perkins*, 871 F. Supp. 801, 803 (M.D. Pa. 1995) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960). "Abandonment analysis under the Fourth Amendment focuses on an individual's reasonable expectation of privacy." *United States v. Thomas*, 423 F. App'x 199, 203 (3d Cir. 2011); *see also United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993) ("The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object."). "When property is voluntarily abandoned before a seizure and retrieved by the police, it has been lawfully recovered and there can be no claim that it was the subject of an unconstitutional seizure." *United States v. Johnson*, 432 F. App'x 118, 120 (3d Cir. 2011) (citing *Hodari*, 499 U.S. at 624. "In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment." *United States v. Felix*, No. 2020-0002, 2021 U.S. Dist. LEXIS 141767, at *9 (D.V.I. July 29, 2021) (citing *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999)).

A person is seized for Fourth Amendment purposes when either (1) "an officer applies physical force" to restrain the person's movement; or (2) the person "submits to an officer's show of authority." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). "[A] police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (citing *Hodari*, 499 U.S. at 626 ("[The Fourth Amendment] does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure.").

17

**2.     Analysis**

Defendant raised for the first time during the suppression hearing that there was an issue of whether the firearm was abandoned (Dkt. No. 56 at 88-89), resulting in the Court ordering the parties to submit supplemental memoranda to address the issue (Dkt. No. 53 at 1). Defendant has given short shrift to this argument in his memorandum, providing just five sentences of analysis to explain the new argument. (Dkt. No. 59 at 4). This leaves the Court to piece together Defendant's statements at the suppression hearing and in his memorandum to understand his argument.

Defendant argues that "President and Santos intended to exert authority over Mr. Allembert to trigger a seizure under the Fourth Amendment" (Dkt. No. 59 at 4) and Defendant "objectively believed that he was under the control of law enforcement" (Dkt. No. 56 at 93). Defendant asserts that he was seized "from the time [law enforcement] turned their lights on." (Dkt. No. 56 at 92). Defendant further argues that "[t]he government offered no evidence that Mr. Allembert intended to abandon the property nor was he observed discarding the firearm." (Dkt. No. 59 at 4). Further, Defendant states that "the timing of the seizure is unknown," the "nexus of the timing between the seizure and abandonment is crucial," and "[t]he government did not offer under a clear and convincing evidentiary standard when Mr. Allembert tossed the firearm for the Court to be able to conduct an objective review." *Id*.

The Court understands Defendant's argument to be as follows: (1) the traffic stop of Defendant violated his Fourth Amendment protections; (2) this unlawful seizure began when TFO Santos activated his lights and sirens; (3) the seizure was ongoing when Defendant involuntarily abandoned the firearm while being pursued by TFO Santos; and (4) the seizure of the firearm is

fruit of the poisonous tree and must be suppressed. Defendant's argument runs contrary to settled law regarding search and seizure and is wholly unconvincing.

First, Defendant's argument falls apart because the Court has already determined that Defendant's traffic stop was lawful. *See supra* Section II.A.2. There is therefore no "poisonous tree" to which Defendant can attach the seizure of the firearm.

Second, case law makes it clear that Defendant's view of when the seizure began is wrong. A seizure has not yet occurred when an individual flees from law enforcement and any property that the individual discards while law enforcement attempts—but has not yet affected—a lawful seizure is deemed abandoned. *See Hodari*, 499 U.S. 621 (1991) (drugs discarded by defendant while running from law enforcement was not fruit of a seizure and not excludable); *United States v. Johnson*, 432 F. App'x 118, 120-21 (3d Cir. 2011) ("[T]he Fourth Amendment did not require the exclusion of the handgun because [defendant] voluntarily abandoned the weapon without ever being the subject of a seizure" when he sped up and discarded the handgun after a police officer activated his lights and siren).

Here, Defendant's fleeing from law enforcement at a high rate of speed (Dkt. No. 31-2 at ¶ 6) was not a submission to law enforcement authority. Rather, that submission occurred—and the seizure began—when Defendant exited his vehicle with his hands up. *Id.* ¶ 9. Because Defendant allegedly discarded the firearm and holster before being seized, it was abandoned and Defendant did not have a reasonable expectation of privacy in that property. *See Felix*, 2021 U.S. Dist. LEXIS 141767, at *9 ("In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment."); *United States v. Wrensford*, No. 2013-0003, 2023 U.S. Dist. LEXIS 19343, at *13-15 (D.V.I. Feb. 6, 2023) (finding that defendant voluntarily abandoned his firearm when he discarded it prior to his seizure and therefore lacked a valid basis

to challenge the seizure of the firearm.). Thus, Defendant's argument that the firearm was not abandoned fails.

### III. CONCLUSION

Having considered all of the foregoing, Defendant Roniel Allembert's Motion to Suppress will be denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: May 17, 2023 _____/s/_____
WILMA A. LEWIS
District Judge